1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DANNY GLENN VANEK,

11              Petitioner,                    No. CIV S-05-1576 LKK DAD P

12         vs.

13   ROSEANNE CAMPBELL, et al.,

14              Respondents.              FINDINGS & RECOMMENDATIONS

15   _____/

16              Petitioner is a state prisoner proceeding through counsel with a petition for a writ

17   of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction

18   entered against him on April 5, 2002, in the Sacramento County Superior Court on charges of

19   two counts of forcible lewd and lascivious conduct and one count of lewd and lascivious

20   conduct.  He seeks relief on the grounds that: (1) his rights under the Confrontation Clause were

21   violated by the trial court's admission of testimony from the victim's mother and a videotape of

22   statements by the victim; (2) the evidence was insufficient to support his conviction on all counts

23   (claims two and three); (3) his Sixth Amendment right to trial by jury and Fifth Amendment right

24   to due process were violated when a judge other than the trial judge ruled on his motion for new

25   trial and pronounced sentence; and (4) his trial counsel rendered ineffective assistance.  Upon

26   /////

                                                1

careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

## PROCEDURAL AND FACTUAL BACKGROUND[1]

Defendant was convicted by a jury of one count of lewd and lascivious conduct (Pen. Code, § 288, subd. (a)) and two counts of aggravated lewd and lascivious conduct (Pen.Code, § 288, subd. (b)(1)). He was sentenced to state prison for an aggregate term of 11 years.

* * *

Facts and Proceedings

The victim, D.W., and her mother, C.W., lived with defendant for about a year. During this year, they changed residences once.

D.W. turned six in September 1997. Defendant turned 32 the following month. He was 5 feet 11 inches tall and weighed 145 pounds.

On November 23, 1997, C.W. went to a store near their home and left D.W. with defendant. C.W. was gone five to 10 minutes. During that time, defendant and D.W. went into a back room of the residence that contained computer equipment. Defendant was wearing shorts and no shirt; D.W. was wearing a skirt and no underpants. Defendant touched D.W.'s "private" with his hand under her clothes. He also directed D.W. to touch his "private" with her hand. Defendant told D.W. not to tell her mother because her mother would get mad.

When C.W. returned from the store, she noticed a change in defendant and D.W. and asked what was going on. Defendant said nothing was going on, turned to D.W. and said, "Right." D.W. "frantically" shook her head no with eyes wide open. C.W.

---

[1] The following summary is drawn from the February 5, 2004 opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), lodged as an Exhibit to Document D filed in support of the answer, at pgs 1-3. The unpublished opinion also appears at People v. Vanek, No. C040892, 2004 WL 219792. This court presumes that the state court's findings of fact are correct unless petitioner rebuts that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004). "Clear and convincing evidence " within the meaning of § 2254(e) "requires greater proof than preponderance of the evidence" and must produce "an abiding conviction" that the factual contentions being advanced are "highly probable." Cooper v. Brown, 510 F.3d 870, 919 (9th Cir. 2007) (quoting Sophanthavong v. Palmateer, 378 F.3d 859, 866 (9th Cir. 2004)). Petitioner has not attempted to overcome the presumption with respect to the underlying events. The court will therefore rely on the state court's recitation of the facts.

continued to ask what was wrong and defendant became agitated. An argument ensued, which led to violence and a call to the police.

Defendant was arrested and thereafter ceased to live with C.W. and D.W.

Around Thanksgiving, D.W. told her mother about the molestation. D.W. said that defendant touched her "privates" and she touched his. D.W. also mentioned an earlier incident of molestation.

On November 29, C.W. called a representative of Women Escaping a Violent Environment (WEAVE) and reported what her daughter had told her. She also reported the matter to the police. Officer Brian Wegesser spoke over the phone to C.W. and then to D.W. D.W. told the officer that defendant sat beside her and put his hand on her knee. Defendant asked her to help pull down his pants and asked her to touch his "private parts" and "pet" him. D.W. said that when she did so, defendant's private part "felt weird and it got real big." However, D.W. told Wegesser that defendant did not touch her.

On December 9, 1997, D.W. was interviewed at the Multi Disciplinary Interview Center (MDIC) by Paula Christian, a forensic interview specialist. During the interview, D.W. indicated that defendant began speaking to her about areas you are not supposed to touch and asked if she was curious about his private places. She told him, "[y]es." He asked her to pull down his shorts, but she said, "no." He told her to "[d]o it," and she complied. He told her to touch his private part and she did so with her hand. D.W. also described a prior incident at the old house when defendant asked her to touch his "private" and she did so. According to D.W., defendant also touched her private parts.

(Opinion at 1-3)

ANALYSIS

I. Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)). A federal writ is not available for alleged error in the interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085. Habeas

corpus cannot be utilized to try state issues de novo. Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003). Section 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001). If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008). See also Frantz v. Hazey, 513 F.3d 1002, 1013 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). Where the state court

4

reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  When it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's deferential standard does not apply and a federal habeas court must review the claim de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

II.  Petitioner's Claims

    A.  Confrontation Clause

       Petitioner first claims that his right to confront the witnesses against him was violated by the admission into evidence of the videotaped interview of the victim at the Multi-Disciplinary Interview Center (MDIC) and the testimony of the victim's mother regarding statements made to her by the victim.  (Pet. at consecutive p. 6.)  Petitioner argues that the videotape should not have been admitted because there was insufficient evidence that the victim's statements to the counselor were reliable.  (Id.)  He also argues that the mother's testimony regarding what the victim allegedly told her about the molestations was not reliable because the mother had "ample opportunity" to coach her daughter.  (Id.)  Petitioner points out that it was the theory of the defense that the victim's mother had fabricated the molestation incidents so that petitioner would not disclose to authorities that the mother had been committing welfare fraud.  In this regard, petitioner notes that the victim answered in the affirmative when asked at trial whether her father, mother, or the district attorney told her what to say in the courtroom in response to questions.  (Id.)  Petitioner points to the following trial testimony to support this argument.

        Q.  (by petitioner's counsel):  Now, before you came in here today, have you talked with your father or your mother or this gentlemen

/////

[sic] to my left about the incidents that you were going to talk
about?

A.  (by the victim):  Yes.

Q.  And did they talk to you and tell you to speak up and to say all
real things?

A.  Yes.

Q.  And did they talk to you about what it was you were going to
testify about?

(Pause.)

A.  No.

Q.  Okay, did they tell you what to say here in court in response to
questions?

(Pause.)

A.  Yes.

(Reporter's Transcript on Appeal (RT) at 154-55.)[2]

---

[2]  However, the court notes that the victim also testified at trial in response to questions
posed by the prosecution as follows:

Q.  (by the prosecutor):  Has your mom ever told you what to say
about [petitioner]?

A.  (by the victim):  No.

Q.  Okay.  Why are you saying that [petitioner] did these things,
Darian?

A.  Because it is true.

* * *

Q.  (by the prosecutor):  Darian, what have I told you to say when
you come to court?

A.  The truth.

Q.  Okay.  How about anybody else . . . um . . . your mom, has your
mom told you what to say when you come to court?

A.  Yes.

6

Petitioner also argues that the videotaped interview of the victim by authorities improperly supported the victim's "contradictory" and "weak" trial testimony.  In this regard, petitioner notes that the trial court questioned whether the interviewer was "suggesting answers" to the victim during the interview.  (Id.)  With respect to the alleged inconsistencies in the victim's trial testimony, petitioner explains:

> [The victim] told her mother that she and petitioner had touched each other's privates, yet a social worker testified that [the victim's] mother told her [the victim] had said that petitioner has seen her "private part" after a bath, but did not touch her.  (RT 236.)  An officer who spoke to [the victim] two days after the incident testified that she told him that [petitioner] never touched her, though he had her touch him.  (RT 240-241.)  At trial, [the victim] said that petitioner touched her "privates" once and that, during the same incident, she touched petitioner's privates, because he asked her to, but there had never been any previous or subsequent touching.  (RT 150-151, 157-158).

(Id.)  Finally, petitioner argues that the improperly admitted videotaped interview  was the only evidence admitted at his trial in support of the charge of lewd and lascivious conduct without force or fear.  (Id.)

/////

/////

---

Q.  What's that?

A.  The truth.

Q.  How about your dad or Matt?

A.  Yes.

Q.  What did they tell you?

A.  The truth.

Q.  Has anybody told you what words to use or what to say when you come to court?

A.  No.

(Id. at 153, 160-61.)

1.  <u>State Court Opinion</u>

Petitioner raised each of the above-described claims on appeal. The California Court of Appeal rejected each of petitioner's arguments, reasoning as follows:

<u>Prior Statements by D.W.</u>

The People moved in limine to introduce evidence of three categories of pretrial statements by D.W.: (1) those made to her mother on November 27; (2) those made over the telephone to Officer Wegesser on November 29; and (3) those made during the MDIC interview on December 9. The People claimed hearsay exceptions for fresh complaints and Evidence Code section 1360 (hereafter section 1360). Regarding the MDIC interview, the prosecutor informed the court: "The interviewer in this case was Paula Christian. She's a forensic interviewer specializing in interviewing children in these cases. The facility is now under the auspices of [Child Protective Services]. The interview was done with a forensic interviewer, in this case, Paula Christian through a one-way mirror witnessed by law enforcement, Sacramento Police Department Detective David Ford. There was a deputy district attorney on the other side of the mirror. That was myself. The mother was not present in the room during the interview. It was kept separate for purposes of noninfluencing the child."

Defendant argued against introduction of the evidence, asserting that there had been no delay between the incident and the report to police. The court responded that the issue under section 1360 is not timing but whether there are sufficient indicia of reliability of the pretrial statements. The court further expressed its belief that sufficient indicia of reliability existed for introduction of the MDIC interview tape, explaining: "[I]t seems to me that the MDIC, as described by [the prosecutor], is the way that it's been advised [sic], that it works under a controlled situation . . . . [¶] So the MDIC, seems to me, is sufficiently reliable unless have you [ sic ] some quibble with the way the MDIC works as represented by [the prosecutor] to the Court."

Defendant then argued against permitting the prosecution to introduce the tape before the testimony of the victim. The court indicated that timing of the evidence was a separate issue. The court concluded: "[T]here's also no question about the reliability getting back to the MDIC because you know what she said because you could see her say it. So there's no question about what they wrote down and had they wrote [ sic ] it down correctly. [¶] So I think I'm going to permit the MDIC statement."

Defendant argued against introduction of the statements to Officer Wegesser because they had been made over the phone. The court reserved ruling on the issue. The court ruled that the statements

made by D.W. to her mother would be admitted, explaining that C.W. would be available for cross-examination to try and prove she made up the report of molestation.  Later, the court ruled to exclude testimony regarding statements made by the victim to Officer Wegesser.

The court did not reach the issue of whether the evidence could come in under the fresh complaint exception to the hearsay rule, and the prosecution did not pursue the matter further.

Defendant contends that the court erred in admitting the tape of the MDIC interview.  He argues that the court failed to undertake the inquiry required by section 1360 and, therefore, introduction of the evidence violated both the hearsay rule and the confrontation clause.  The People counter that the court conducted the inquiry required by section 1360 and the evidence was properly admitted.

"The confrontation clause of the Sixth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides that '"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."'  (Idaho v. Wright (1990) 497 U.S. 805, 813 [110 S.Ct. 3139, 3145, 111 L.Ed.2d 638, 651].)  The confrontation clause precludes admission of hearsay evidence unless the prosecution demonstrates that the statement possesses adequate indicia of reliability.  Reliability may be inferred, without more, if the evidence is admitted under a firmly rooted hearsay exception. Otherwise, the evidence is presumed unreliable and must be excluded absent a showing of particularized guarantees of trustworthiness such that adversarial testing would be expected to add little, if anything to the statement's reliability.  (White v. Illinois (1992) 502 U.S. 346, 357 [112 S.Ct. 736, 743, 116 L.Ed.2d 848, [860]]; Idaho v. Wright, supra, at pp. 814-816, 818, 820-821 [110 S.Ct. at pp. 3145-3147, 3148, 3149-3150; People v. Eccleston [ (2001) 89 Cal.App.4th 436, 443]; People v. Duke [ (1999) 74 Cal.App.4th 23, 29 [87 Cal.Rptr.2d 547].)  Whether '"particularized guarantees of trustworthiness"' exist is determined by examining 'the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief.'  (Idaho v. Wright, supra, at pp. 819, 820 [110 S.Ct. at pp. 3148, 3149].)"  (People v. Roberto V. (2001) 93 Cal.App.4th 1350, 1373-1374.)

Section 1360, subdivision (a) reads:

"In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse or neglect performed with or on the child by another, or describing any attempted act of child abuse or neglect with or on the child by another, is not made inadmissible by the hearsay rule if all of the following apply:

9

"(1) The statement is not otherwise admissible by statute or court rule.

"(2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability.

"(3) The child either:

"(A) Testifies at the proceedings.

"(B) Is unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child."

Section 1360 was enacted in 1995 (Stats.1995, ch. 87, § 3, pp. 222-223) and is "too new to be considered a firmly rooted hearsay exception because it does not reflect 'longstanding judicial and legislative experience in assessing the trustworthiness' of the statements it covers; the statute must therefore satisfy the 'particularized guarantees of trustworthiness' standard under the confrontation clause." (People v. Eccleston (2001) 89 Cal.App.4th 436, 445.) "'The nonexhaustive list of factors that the United States Supreme Court has cited as relevant to the reliability of hearsay statements made by child witnesses in . . . abuse cases are (1) spontaneity and consistent repetition; (2) the mental state of the declarant; (3) use of terminology unexpected of a child of a similar age; and (4) lack of motive to fabricate. [Citation.]'" (In re Lucero L. (2000) 22 Cal.4th 1227, 1239; see also People v. Roberto V., supra, 93 Cal.App.4th at p. 1374.) In each case, the ultimate question is whether "'the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility . . . .'" (People v. Greenberger (1997) 58 Cal .App.4th 298, 327.)

Defendant contends that the trial court failed to undertake the inquiry necessary to determine reliability of the MDIC statements. The court did not view the interview tape; instead, it relied solely on the representations of the prosecutor concerning the interview process. Defendant argues that if the court had undertaken the proper inquiry, it would have concluded that none of the factors relevant to reliability was satisfied. According to defendant, the statements were not spontaneous, the victim gave differing accounts of what happened, there was clear motive for fabrication in that defendant had threatened to report C.W. for welfare fraud, and, as the court itself later observed, the interview was unduly suggestive.

The People argue that the court undertook the necessary inquiry and concluded that there is no question about reliability of the MDIC interview because the tape is available for viewing.

According to the People, "[t]he videotaped nature of [D.W.]'s MDIC statements tipped the reliability scale in favor of admission and overcame any of the usual problems inherent in the reliability of hearsay evidence . . . ."

The People misunderstand the issue. The question here is not whether there are sufficient indicia of reliability that the victim made the statements attributed to her, but whether the statements themselves are sufficiently reliable, i.e., whether the victim was being truthful when she made the statements. The fact that the exact statements made by the victim are available to the jury through the tape is irrelevant.

On the record before us, it does not appear that the trial court conducted the necessary inquiry on the reliability of the victim's MDIC statements. The court appears to have considered only the nature of the MDIC interview process itself, as represented by the prosecutor, and not any of the factors identified by the United States Supreme Court or any other relevant factors. Nevertheless, we find any error in this regard harmless beyond a reasonable doubt. (See Chapman v. California (1966) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].)

Even if the trial court had undertaken the inquiry suggested by defendant, its findings concerning the indicia of reliability of the statements admitted under section 1360 would have been subject to independent review on appeal. (Lilly v. Virginia (1999) 527 U.S. 116, 136-137 [144 L.Ed.2d 117, 134]; People v. Eccleston, supra, 89 Cal.App.4th at p. 445.) Thus, we undertake our own independent consideration of the relevant factors.

Obviously, the MDIC interview statements by D.W. were not spontaneous. Her statements were responses to questions and prompting by the interviewer. On the other hand, there is no indication the victim had previous knowledge of the questions that would be asked and, therefore, had no opportunity to fabricate the answers. Neither the victim's mother nor anyone else was present to coach her. The victim was clearly reluctant to speak at all.

The repetition of consistent statements that corroborate each other provides a measure of trustworthiness to those statements. (People v. Eccleston, supra, 89 Cal.App.4th at p. 446.) Although the victim's various accounts of what occurred differed somewhat, this can hardly come as a surprise given the victim's age at the time of those statements. D.W. was only six years old when she was interviewed and the statements involved a matter of extreme sensitivity. Furthermore, the inconsistencies in the three categories of pretrial statements were less significant than defendant suggests.

D.W. told her mother at Thanksgiving that she and defendant touched each other's privates in the room with computer

11

equipment.  D.W. said defendant asked her to pull down his pants and D.W. said, "no."  D.W. said defendant asked her if she was curious and asked if she wanted to touch his penis.  D.W. told her mother about two separate incidents.  D.W. also said defendant told her not to tell her mother because her mother would not like what they had done.

On November 29, D.W. spoke to Officer Wegesser.  D.W. discussed only the incident that occurred just before Thanksgiving and indicated defendant asked her to help pull down his shorts and she touched his penis, which felt weird and got big.  D.W. said she was sitting next to defendant, who put his hand on her knee, asked if she was curious, and asked her to touch his private parts.  D.W. said defendant did not touch her privates on this occasion.

In the MDIC interview, D.W. described the incident that occurred before Thanksgiving.  She said defendant asked if she was curious about his private places and she said, "yes."  He asked her to pull down his shorts and she said, "no."  He then told her to do it.  He asked her to touch his private part and she did so gently with her hand.  Defendant told D.W. not to tell her mother because her mother would get mad.  D.W. said defendant also touched her private parts.  D.W. stated such touching of each other had occurred at another time while they were living in the old house.

D.W. consistently stated that in an incident that occurred before Thanksgiving when her mother was away, defendant began talking about private parts, asked if she was curious about his private parts, asked her to help pull down his shorts, and asked her to touch his private parts.  She consistently indicated she touched defendant's private parts and that defendant told her not to tell her mother.  In her statements to her mother and in the MDIC interview, D.W. also reported an earlier incident.  Although this earlier incident was not mentioned in the conversation with Officer Wegesser, there is no indication the subject ever came up.  D.W. never said there was only one incident.  The only inconsistency of any significance in the separate statements is D.W.'s indication in her conversation with Officer Wegesser that defendant had not touched her in the incident that occurred before Thanksgiving.  However, as explained previously, given D.W.'s age at the time and the sensitivity of the subject, this is not surprising.

Defendant contends that there was "clear evidence of a motive to fabricate . . . ."  However, the only motive mentioned by defendant is that defendant had informed C.W. he intended to report her for welfare fraud.  Assuming there is evidence to support this claim, we fail to see how it establishes a motive to fabricate the charges against defendant.  If Defendant had threatened C.W., this would establish a motive for her not to report the molestation in order to keep defendant quiet.  At any rate, C.W.'s motive to fabricate is not

the issue. The question is whether D.W. had such a motive. There is no evidence she was aware of defendant's alleged threat.

Finally, defendant contends that the court itself believed the MDIC interview was suggestive. Defendant bases this on a comment made by the court during argument over whether the defense would be permitted to present an expert to testify about proper interviewing techniques. The court said: "[T]he fact that they train people to do interviewing specifically shows them that an interview is not a common, is not something ordinary people can do or know how to do. I do also think, if you recall, Mr. Huggins, and I'm not sure that I said it to counsel on the record or off the record, but I thought in some instances the questioner in my opinion appeared to be suggesting answers . . . ."

We have reviewed the transcript of the MDIC interview and the tape of the interview itself and conclude that there is nothing particularly suggestive in the questions asked by the interviewer beyond what appears to have been necessary to overcome the victim's reluctance to talk about the incidents. The interview was conducted out of the presence of others and was not preceded by any accusations against defendant. The victim was adequately informed of the importance of telling the truth, and her ability to do so was established.

Of the other factors mentioned by the United States Supreme Court, there is no particular evidence in the record regarding the victim's mental state beyond the fact of her tender years. There was no terminology used by D.W. in the interview that was unexpected for a child her age.

Based on the totality of the circumstances presented, including our independent assessment of the factors bearing on reliability, we are satisfied beyond a reasonable doubt that the trial court's error is harmless because the MDIC interview tape, properly tested for reliability, required that it be admitted.

As to D.W.'s statements to her mother, defendant argues that these were inconsistent with other pretrial statements. However, as discussed earlier, such inconsistencies are not significant. Defendant further argues that there was "strong evidence of a motive to fabricate on [C.W.]'s part, further rendering her statement unreliable." But reliability of C.W.'s recitation of what the victim told her is not the issue. C.W.'s testimony about what she was told was subject to cross-examination. The question is whether D.W. reliably reported to her mother what happened. There is no evidence D.W. had a motive to fabricate the events.

/////

/////

13

1  Thus, any failure of the trial court to fully explore reliability was
2  harmless beyond a reasonable doubt.

3  (Opinion at 4-14.)

4  2. Applicable Law

5  The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal

6  prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

7  him. . . ." U.S. Const. amend. VI. This right, extended to the States by the Fourteenth

8  Amendment, includes the right to cross-examine witnesses. Cruz v. New York, 481 U.S. 186,

9  189 (1987) (citing Pointer v. Texas, 380 U.S. 400, 404 (1965)). "The central concern of the

10  Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by

11  subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."

12  Lilly v. Virginia, 527 U.S. 116, 124 (1999) (quoting Maryland v. Craig, 497 U.S. 836, 845

13  (1990)). See also Davis v Alaska, 415 U.S. 308, 315 (1974) (a primary interest secured by the

14  Confrontation Clause is the right of cross-examination). However, "when the declarant appears

15  for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of

16  his prior testimonial statements." Crawford v. Washington, 541 U.S. 36, 59 n.9 (2004). See also

17  California v. Green, 399 U.S. 149, 162 (1970) ("where the declarant is not absent, but is present

18  to testify and to submit to cross-examination, our cases, if anything, support the conclusion that

19  the admission of his out-of-court statements does not create a confrontation problem"). When

20  the declarant is available, "it is irrelevant that the reliability of some out-of-court statements

21  cannot be replicated, even if the declarant testifies to the same matters in court." Crawford, 541

22  U.S. at 59 n.9 (citations omitted.) The Confrontation Clause "does not bar admission of a

23  statement so long as the declarant is present at trial to defend or explain it." Id.

24  3. Analysis

25  Here, the victim testified at trial and was subject to cross-examination. The

26  victim's mother also testified and was subject to impeachment regarding whether she was

14

manufacturing her daughter's statements about acts of molestation by petitioner. Thus, the admission of the victim's prior statements to her mother and to the MDIC social worker did not violate petitioner's rights under the Confrontation Clause. See Green, 399 U.S. at 157-64; Delaware v. Fensterer, 474 U.S. 15, 21-22 (1985) ("the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose . . . infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony"); United States v. Valdez-Soto, 31 F.3d 1467, 1470 (9th Cir. 1994) ("We are aware of no Supreme Court case, or any other case, which holds that introduction of hearsay evidence can violate the Confrontation Clause where the putative declarant is in court, and the defendants are able to cross-examine him"). Because there is no violation of the right to confrontation when the declarant is available for cross-examination, petitioner is not entitled to relief on these claims.[3]

B. Sufficiency of the Evidence

In claims two and three, petitioner asserts that the evidence introduced at trial was insufficient to support his conviction on any of the three counts against him. (Pet. at consecutive pgs. 7-8.) With regard to his conviction on the charge of engaging in lewd and lascivious conduct, petitioner argues that the testimony at trial did not support a finding that he molested the victim at any time other than the November 23, 1997, incident. (Id. at consecutive p. 7.) With

---

[3] Petitioner does not raise a claim that the state court violated California Penal Code § 1360 by admitting the victim's prior statements into evidence at his trial. Even if he had, such a claim would not be cognizable in this federal habeas corpus proceeding. As explained above, "it is not the province of a federal habeas court to reexamine state court determinations on state law questions." Estelle v. McGuire, 502 U.S. 62, 67 (1991). See also Aponte v. Gomez, 993 F.2d 705, 707 (9th Cir. 1993) (federal courts are "bound by a state court's construction of its own penal statutes"); Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir. 1989) (a federal habeas court must defer to the state court's construction of its own penal code unless its interpretation is "untenable or amounts to a subterfuge to avoid federal review of a constitutional violation"). In any event, the conclusion of the state court in this case that the victim's statements to the MDIC worker and to her mother were reliable and therefore admissible under state law is not contrary to or an unreasonable application of federal law. Accordingly, petitioner is not entitled to relief on any such claim.

regard to his conviction on the two counts of lewd and lascivious conduct by force and fear, petitioner argues that there was no evidence that the victim was afraid of him, either before or after the incident on November 23, 1997. (Id. at consecutive p. 8.)

Petitioner raised each of these claims on appeal, advancing the identical arguments he makes to this court. (Answer, Lodged Document A, at 23-34.) The California Court of Appeal rejected petitioner's arguments, reasoning as follows:

Sufficiency of the Evidence – Count Three

Defendant contends that there is insufficient evidence to support count three, which charged nonaggravated lewd and lascivious conduct. He argues that the victim's references to a second incident of molestation, which was the basis of this count, were vague and inconsistent. We are not persuaded.

"The test on appeal for determining if substantial evidence supports a conviction is whether '"a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt."' [Citation.] In making this determination, we '"must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."'" (People v. Iniguez (1994) 7 Cal.4th 847, 854.) However, in making this determination, we do not limit our review to isolated bits of evidence but, instead, consider the whole record. (People v. Johnson (1980) 26 Cal.3d 557, 577-578.)

Defendant contends that C.W. testified about what the victim told her on Thanksgiving and "[n]o mention was made of any earlier incident." This is not true. During cross-examination, C.W. testified as follows:

"A. That one incident had occurred the day of the fight, yes.

"Q. Right. Because she didn't tell you about any other incidents, did she?

"A. Well, there were two that she told me about that day.

"Q. On Thanksgiving?

"A. On Thanksgiving.

"Q. And it was Danny touching her and she touching him, right?

"A. Right.

16

"Q. Okay. But she meant that this happened on the day of the fight?

"A. No, there were two separate incidents."

C.W. was not asked for further details concerning what D.W. told her about this other incident.

Defendant also contends that C.W. called WEAVE to report the matter and told WEAVE that D.W. told her that defendant had not touched her private parts. However, C.W. testified that when she called WEAVE, she was "very confused" and could not recall what she said.

Defendant next contends that when Officer Wegesser spoke with D.W. on the phone on November 29, D.W. said defendant did not touch her private parts on the one occasion before Thanksgiving. There was no discussion of any other incident.

Defendant contends that D.W. was also confused in the MDIC interview and appeared to have merged the two alleged incidents into one. In that interview, D.W. said defendant asked her to touch his penis at the "old house." Later, she indicated that defendant "touched [her] private" at the old house "a long time ago." D.W. said she was in a chair and she was wearing a vest and no underwear. D.W. was then asked details about what happened in this incident:

"CHRISTIAN: Okay. He-he started talking to you about privates. And then what was the next thing you said? I can't hear you. You've got to speak up.

"[D.W.]: Um, –

"CHRISTIAN: And then he –

"[D.W.]: I said (inaudible)-at first he talks about it. And then he said to touch my private, and I touched it. And I –

"CHRISTIAN: Okay. So the first thing –

"[D.W.]: Then he wanted – then I wanted to (inaudible). And then he, um, said it was time – time to go to sleep. (Inaudible.)

"CHRISTIAN: Okay. So you guys were talking about private parts. Were you talking about touching private parts or just –

"[D.W.]: (No audible response.)

"CHRISTIAN: Touching private parts. Okay. And then you touched his private part?

"[D.W.]: No.  No.  He touched mine.

"CHRISTIAN: Awe.  He touched your private part.  What kind of a touch was it?

"[D.W.]: Um, each one was a soft one.

"CHRISTIAN: Each one was a soft – how many different times did he touch your private?

"[D.W.]: Once.

"CHRISTIAN: One time.  Okay.  Was it, um, – some touches are like hits or slaps or rubs or –

"[D.W.]: Rub.

"CHRISTIAN: – pokes – rub.  Okay.  It was a rub.  All right.

"[D.W.]: Soft rub.

D.W. then informed the interviewer that she also touched defendant's privates on this occasion, after which they played cartoons on the computer and went to dinner.

Finally, defendant contends that D.W. testified at trial that there had been no incidents other than the one before Thanksgiving.  This again is not true.  At trial, D.W. testified about the one incident that occurred before Thanksgiving when she and defendant touched each other's privates.  Although D.W. said this was the only time defendant touched her privates, she was not asked specifically about an earlier incident and was not asked if she had touched defendant on another occasion.

In his argument to the jury, the prosecutor urged conviction of defendant on count three based on D.W.'s statements during the MDIC interview that defendant had touched her privates during the earlier incident.  The MDIC interview fully supports this charge.  D.W. told the interviewer that defendant touched her "private" at the old house and that it was a soft rub.  Although D.W. testified at trial that she had been touched only once by defendant, in the incident that occurred just before Thanksgiving, the jury was free to disregard this testimony, which came over three years after the incidents, in favor of the MDIC interview.  There is substantial evidence to support defendant's conviction on count three.

Sufficiency of the Evidence-Duress

Defendant contends that there is insufficient evidence of duress to support his two convictions for aggravated lewd and lascivious conduct.

Section 288, subdivision (b)(1) prohibits a lewd act committed "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person . . . ." There is no evidence here of force, violence, menace or fear of immediate and unlawful injury. Duress, within the meaning of section 288, subdivision (b)(1), means "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or[ ](2) acquiesce in an act to which one otherwise would not have submitted." (People v. Pitmon (1985) 170 Cal.App.3d 38, 50.) "[D]uress involves psychological coercion. [Citation.] Duress can arise from various circumstances, including the relationship between the defendant and the victim and their relative ages and sizes. [Citations.] 'Where the defendant is a family member and the victim is young, . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim' is relevant to the existence of duress." (People v. Schulz (1992) 2 Cal.App.4th 999, 1005.)

In People v. Espinoza (2002) 95 Cal.App.4th 1287, no duress was found where the defendant did not restrain the victim and the victim offered no resistance. (Id. at p. 1320.) According to the court: "No evidence was adduced that defendant's lewd act and attempt at intercourse were accompanied by any 'direct or implied threat' of any kind. While it was clear that [the victim] was afraid of defendant, no evidence was introduced to show that this fear was based on anything defendant had done other than to continue to molest her." (Id. at p. 1321.)

In People v. Hecker (1990) 219 Cal.App.3d 1238, the court found no duress where the victim was not afraid the defendant would harm her (id. at p. 1242), but testified that she felt "'pressured psychologically'" and "'subconsciously afraid'" (id. at p. 1250). However, there was no evidence the defendant was aware of, or sought to take advantage of, such fear. ( Ibid.) The court explained: "'Psychological coercion' without more does not establish duress. At a minimum there must be an implied threat of 'force, violence, danger, hardship or retribution.'" (Id. at pp. 1250-1251.)

Although the evidence of duress here was not overwhelming, it was more than that presented in the foregoing cases. In addition to the substantial size and age differences between defendant and D.W., defendant was in a position of authority and was, at least temporarily, filling the role of the victim's father. The offenses occurred at a time when D.W. was left under defendant's supervision. Defendant and D.W. were in a back room of the residence and defendant prohibited D.W. from departing. When D.W. declined to do something defendant requested, he told her to "[d]o it."

1    The People also point out that defendant warned D.W. not to tell
     her mother because her mother would get mad.  According to the
2    People, "[a] simple warning to a child not to report a molestation
     reasonably implies the child should not otherwise protest or resist
3    the sexual imposition."  The People cite <u>People v. Cochran</u> (2002)
     103 Cal.App.4th 8 at page 15, where the court said: "A threat to a
4    child of adverse consequences, such as suggesting the child will be
     breaking up the family or marriage if she reports or fails to
5    acquiesce in the molestation, may constitute a threat of retribution
     and may be sufficient to establish duress . . . ."
6
     While we agree that a threat of adverse consequences, if the child
7    does not acquiesce in the molestation, may be sufficient to
     establish duress, we cannot agree that a threat of such
8    consequences, if the child reports the molestation, has the same
     effect.  Evidence of such a threat "establishes merely the threat of
9    hardship directed at 'later disclosure of the sex acts and not [the
     failure to perform] the sex acts themselves.'"  (<u>People v. Hecker</u>,
10   <u>supra</u>, 219 Cal.App.3d at p. 1251, fn. 7, quoting from <u>People v.
     Bergschneider</u> (1989) 211 Cal.App.3d 144, 154, fn. 8; italics
11   omitted.)  In other words, such a threat coming after the
     molestation, could not have affected the victim's resistance.
12
     Nevertheless, we agree with the People that there is substantial
13   evidence of duress under the facts of this case.  The age and size
     differences, defendant's position of authority, the location of the
14   molestations, the restraint of the victim, and the order to "[d]o it"
     after the victim said no are sufficient to establish an implied threat
15   of harm if the victim did not acquiesce.

16   (Opinion at 19-26.)

17          The Due Process Clause of the Fourteenth Amendment "protects the accused

18   against conviction except upon proof beyond a reasonable doubt of every fact necessary to

19   constitute the crime with which he is charged."  <u>In re Winship</u>, 397 U.S. 358, 364 (1970).  There

20   is sufficient evidence to support a conviction if, "after viewing the evidence in the light most

21   favorable to the prosecution, any rational trier of fact could have found the essential elements of

22   the crime beyond a reasonable doubt."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).  "[T]he

23   dispositive question under <u>Jackson</u> is 'whether the record evidence could reasonably support a

24   finding of guilt beyond a reasonable doubt.'"  <u>Chein v. Shumsky</u>, 373 F.3d 978, 982 (9th Cir.

25   2004) (quoting <u>Jackson</u>, 443 U.S. at 318).  "A petitioner for a federal writ of habeas corpus faces

26   a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction

on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In order to grant the writ, the federal habeas court must find that the decision of the state court reflected an objectively unreasonable application of Jackson and Winship to the facts of the case. Id. at 1275 & n.13.

The court must review the entire record when the sufficiency of the evidence is challenged in habeas proceedings. Adamson v. Ricketts, 758 F.2d 441, 448 n.11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987). It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319. If the trier of fact could draw conflicting inferences from the evidence, the court in its review will assign the inference that favors conviction. McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994). The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict. United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991). Thus, "[t]he question is not whether we are personally convinced beyond a reasonable doubt" but rather "whether rational jurors could reach the conclusion that these jurors reached." Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991). The federal habeas court determines sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

Viewing the evidence in the light most favorable to the verdict, and for the reasons described by the California Court of Appeal, the undersigned concludes that there was sufficient evidence from which a rational trier of fact could have found beyond a reasonable doubt that petitioner was guilty of the charges against him. The state court opinion rejecting petitioner's argument in this regard is a reasonable construction of the evidence in this case and is not contrary to or an objectively unreasonable application of federal law. See Woodford v. Visciotti, 537 U.S. 19, 25 (2002); see also 28 U.S.C. § 2254(d)(1). Although the evidence supporting petitioner's convictions may not have been overwhelming, the state court's decision

21

that the evidence was sufficient to support conviction on the charges is certainly not unreasonable. Accordingly, petitioner is not entitled to habeas relief on his claim that the evidence introduced at his trial was insufficient to support his conviction on charges of lewd and lascivious conduct and forcible lewd and lascivious conduct.

C. Substitution of Judges

In his fourth claim, petitioner contends that his Sixth Amendment right to trial by jury and his Fifth Amendment right to due process of law were violated when a judge other than the trial judge presided over his motion for new trial and the sentencing proceedings. (Pet. at consecutive p. 9.) Petitioner notes that the motion for new trial was denied. (Id.) With regard to the sentencing proceedings, petitioner directs the court's attention to remarks made by the judge at the time he pronounced sentence, to the effect that he was in the "not rare, but somewhat unusual" position of sentencing a defendant without having "observed the credibility of witnesses, talked to counsel, listened to the evidence, and seen it live in the course of the trial;" that he had to "make a decision for sentencing off of documents and cold sheets of paper and words;" and that had he "sat through the trial, observed [the victim], listened to all the evidence, I may have a different opinion as to what occurred." (RT at 575-58.) Petitioner also notes that the trial judge observed at the hearing on petitioner's motion for acquittal that "this is not one of the strongest cases the district attorney has brought down the road." (Id. at 326.)

Respondent argues that petitioner has failed to exhaust these claims in state court. (Answer at 2, 17.) Even if the claims are unexhausted, however, this court will recommend that habeas relief be denied on the merits. See 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"); Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005) (a federal court considering a habeas petition may deny an unexhausted claim on the merits when it is perfectly clear that the claim is not "colorable").

/////

22

In state court, petitioner objected to the substitution of judges on statutory and
constitutional grounds.  The California Court of Appeal declined to address petitioner's
constitutional arguments on appeal because petitioner had failed to present any supporting
argument or  citations to authority.  The state court reasoned as follows:

Substitution of Judge at Sentencing

This matter was tried before Judge Ronald Robie.  However, prior
to determination of defendant's motion for new trial, Judge Robie
was appointed by the Governor to this court.  The matter was
thereafter transferred for all purposes to Judge Gary Mullen.
Defendant contends that the substitution of Judge Mullen violated
section 1053 as well as several constitutional protections.  He
contends that he was prejudiced in being sentenced by a judge who
based his discretionary decisions on "'cold pieces of paper and
words.'"

Section 1053 reads: "If after the commencement of the trial of a
criminal action or proceeding in any court the judge or justice
presiding at the trial shall die, become ill, or for any other reason
be unable to proceed with the trial, any other judge or justice of the
court in which the trial is proceeding may proceed with and finish
the trial . . . ."

"[W]hen the original judge becomes unavailable during trial,
prudent substitution may have no actual effect on fairness and is
often manifestly preferable to a mistrial.  For this reason,
California and federal courts have long possessed express
substitution authority."  (People v. Gonzalez (1990) 51 Cal.3d
1179, 1211.)  "[M]any modern decisions reject the notion that
reversal is always required when a mid-trial substitution occurs
without the defendant's affirmative consent.  These cases confirm
that a well-justified change of judges, even if technically
erroneous, is no basis for reversal if the accused failed to object
and no substantial prejudice resulted."  (Ibid.)

Defendant did not object to reassignment of the case to Judge
Mullen after Judge Robie's elevation to the Court of Appeal.
Although defense counsel urged Judge Robie to return to the
Superior Court and preside over the remainder of the proceedings
by special assignment, and Judge Robie expressed his willingness
to do so if defendant took the proper steps to bring this about,
defendant did nothing further in this regard.  Defendant did not
object to the substitution at the time of the hearing on his new trial
motion or at the time of sentencing.

Defendant cites nothing in the record to suggest he was prejudiced
by the substitution.  Defendant does not claim prejudice with

respect to the new trial motion.  Regarding sentencing, defendant argues that "Judge Mullen knew nothing about the evidence," whereas Judge Robie expressed his belief that "'this is not one of the strongest cases the district attorney has brought down the road.'"  Defendant further asserts that Judge Robie expressed a belief that the videotape, "which was by far the strongest aspect of the prosecution's case, was conducted by an interviewer who suggested answers to [D.W.]."

Defendant misreads the record.  To say that Judge Mullen knew nothing about the evidence is absurd.  Judge Mullen took time to review defendant's voluminous new trial motion before ruling on it.  This necessarily required a review of the evidence.  During Judge Mullen's recitation of reasons for denying the motion, he cited numerous times to the evidence in the record.  He also mentioned the arguments of counsel.  Judge Mullen also read the transcript of the MDIC interview.  To the extent it would have been beneficial to review the tape of the interview also, that tape was available to him.

As to Judge Robie's comment that this was not a strong case, this comment was made in connection with defendant's motion for acquittal (§ 1118).  While Judge Robie may have thought the case was close, he nevertheless denied the motion and the jury returned guilty verdicts.

Finally, we disagree with defendant's assessment that the MDIC interview tape was the strongest evidence in the case.  The strongest evidence was the testimony of the victim.  Furthermore, although Judge Robie indicated he thought there may have been a couple of places where the interviewer brought up something that had not yet been mentioned by the victim, he said he had no idea whether this was suggestive.

Defendant points to no aspect of sentencing that might have been different if he had been sentenced by Judge Robie rather than Judge Mullen. Defendant's claim under section 1053 is therefore rejected.

As to defendant's separate claim of constitutional error, he raises no arguments in this regard.  Where a point is raised in an appellate brief without argument or legal support, "it is deemed to be without foundation and requires no discussion by the reviewing court."  (Atchley v. City of Fresno (1984) 151 Cal.App.3d 635, 647.)

Defendant contends that to the extent trial counsel was required to object to substitution of a new judge, he received ineffective assistance of counsel.  However, because we conclude that there is nothing in the record to suggest defendant was prejudiced by the substitution, we need not consider his ineffective assistance claim.

1    (See People v. Lewis (1990) 50 Cal.3d 262, 288 [A defendant
     claiming ineffective assistance must also show "it is reasonably
2    probable that a more favorable determinations would have resulted
     in the absence of counsel's failings"].)
3

4    (Opinion at 26-29).

5           Because the state court did not reach the merits of petitioner's constitutional

6    claims regarding the substitution of judges, this court will review the claims de novo.  Nulph,

7    333 F.3d at 1056.[4]

8           Petitioner has cited no authority in support of his claim that his federal

9    constitutional rights were violated when the judge who sentenced him and decided his motion for

10   new trial was not the same judge who presided over his trial.  Indeed, petitioner has not even

11   demonstrated that his rights under state law were violated by the substitution of judges.[5]  Finally,

12   even assuming arguendo that the substitution of Judge Mullen for Judge Robie violated

13   petitioner's federal constitutional rights, petitioner has failed to demonstrate that the error was

14   prejudicial.  The error alleged by petitioner is a "trial error," which is subject to harmless error

15   analysis.  Arizona v. Fulminante, 499 U.S. 279, 306 (1991).  "[A] federal court may grant habeas

16   relief based on trial error only when that error had substantial and injurious effect or influence"

17   on the proceedings.  Brecht v. Abrahamson, 507 U.S. 619, 627 (1993).  A federal court must

18   _____

19         [4] Respondent argues that this court must analyze petitioner's claim under the AEDPA
     standard of review because the state law standard of review applied by the California Court of
20   Appeal in concluding that petitioner was not prejudiced by the substitution of judges was
     "identical to the federal standard." (Answer at 20.)  Petitioner cites several out-of-circuit cases in
21   which federal habeas courts utilized the AEDPA standard of review where the state court had
     analyzed a federal constitutional claim using a state law standard of review that was the same as,
22   or more stringent than, the federal standard.  (Id.)  In this case, however, the state court did not
     analyze petitioner's constitutional arguments under state law.  Rather, the California Court of
23   Appeal expressly declined to reach the merits of petitioner's constitutional arguments because
     they had not been briefed.  Accordingly, the cases cited by respondent do not apply to this
24   situation.  As explained above, this court will analyze petitioner's claims under a de novo
     standard of review.

25         [5] In federal criminal trials, as in state court trials, a different judge than the trial judge
     may complete the proceedings if "the judge before whom the trial began cannot proceed because
26   of death, sickness, or other disability."  Fed. R. Crim. P. 25(a).

                                             25

assess the prejudicial impact of an error under the <u>Brecht</u> standard in all habeas cases regardless of the error standard applied by the state court, or even if the state court has not reached harmless error analysis because it found no error. <u>Fry v. Pliler</u>, 551 U.S. 112 (2007).

For the reasons set forth by the California Court of Appeal, petitioner has failed to demonstrate that any error in assigning another judge to his case after the trial judge was elevated to the appellate court had a substantial and injurious effect or influence on the proceedings. As in his appellate brief in state court, petitioner does not articulate any specific prejudice with respect to the ruling on his motion for new trial and this court finds no evidence that the ruling was improper or unfair. With respect to the sentencing proceedings, although the sentencing judge made the remarks quoted above, there is no evidence that he was unprepared to pronounce sentence or that the sentence imposed was improper or erroneous under state law in any way. In fact, petitioner was sentenced to the term recommended by the probation department, which fell "within line [sic] for these charges of other sentences for similar kinds of conduct." (RT at 578.) There is also no indication the sentencing judge was impartial or biased or that anything about the sentencing proceedings was fundamentally unfair. <u>Cf.</u> <u>Duckett v. Godinez</u>, 67 F.3d 734, 740 (9th Cir. 1995) (on habeas review, the standard for reversing a verdict because of judicial misconduct or bias is warranted if "the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution").

Because petitioner has failed to demonstrate that any error in having a new judge rule on his motion for new trial and pronounce sentence prejudiced the state court proceedings, petitioner is not entitled to habeas corpus relief on these claims.

D. <u>Ineffective Assistance of Trial Counsel</u>

Petitioner's final claim is that his trial counsel rendered ineffective assistance by failing to "investigate and argue petitioner's defense that [the victim's] mother had fabricated the charges because she feared disclosure that she had been committing welfare fraud." (Pet. at consecutive p. 10.) Petitioner also argues that defense counsel "could have elicited from

Detective Ford an admission that he was aware of the welfare fraud issue in this case, since petitioner had told him that he had reported [the victim's] mother for violations."  (Id.)

The California Court of Appeal rejected petitioner's arguments, reasoning as follows:

Ineffective Assistance of Counsel

Defendant contends that he received ineffective assistance of counsel because his attorney failed to pursue a theory that the victim's mother had fabricated the molestation charges in response to his threat to report her for welfare fraud.  Defendant contends that he discovered the fraud on November 23, confronted C.W. and ordered her to vacate the residence, for which he was paying the rent.  According to defendant:  "In an effort to secure the house and its contents, and to stave off any actions taken against her, [C .W.] began a campaign of false charges against [him] . . . ."  Defendant argues that he presented these facts to defense counsel, but counsel "failed to adequately investigate this crucial defense."  As a result, defendant asserts, the jury was never presented with an explanation for why C.W. "would use her daughter to contrive false allegations of this disturbing nature against [him]."

Under both the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution, a criminal defendant has a right to the assistance of counsel.  (See Strickland v. Washington (1984) 466 U.S. 668, 684-685 [80 L.Ed.2d 674, 691-692]; People v. Pope (1979) 23 Cal.3d 412, 422.)  This right "entitles the defendant not to some bare assistance but rather to effective assistance."  (People v. Ledesma (1987) 43 Cal.3d 171, 215.)  "To establish entitlement to relief for ineffective assistance of counsel the burden is on the defendant to show (1) trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determinations would have resulted in the absence of counsel's failings."  (People v. Lewis, supra, 50 Cal.3d at p. 288.)

Defendant fails to satisfy the first element of his ineffective assistance claim.  He argues that counsel should have investigated and presented evidence that C.W. was committing welfare fraud and that defendant threatened to turn her in.  However, competent defense counsel could readily have concluded that such evidence would not have assisted defendant's case.  If defendant had threatened C.W. with exposure, this would have been incentive for her to suppress any charges against defendant rather than fabricate them.  A reasonable jury could have concluded that C.W. would not have made up charges against defendant in the face of such a

threat, because to do so would likely have pushed defendant over the edge and made him follow through with his threat.

"In evaluating a defendant's claim of deficient performance by counsel, there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' [citations], and we accord great deference to counsel's tactical decisions. [Citations.] Were it otherwise, appellate courts would be required to engage in the "perilous process'" of second-guessing counsel's trial strategy. Accordingly, a reviewing court will reverse a conviction on the ground of inadequate counsel 'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.'" (People v. Frye (1998) 18 Cal.4th 894, 979-980.)

The record before us does not affirmatively show that defense counsel had no tactical purpose for failing to pursue defendant's theory. Hence, the judgment below will not be upset on this basis.

(Opinion at 30-32.)

The state trial court also rejected petitioner's claim, made in his motion for new trial, that his trial counsel rendered ineffective assistance in failing to investigate and present evidence that the charges against petitioner had been manufactured by the victim's mother because she was afraid that petitioner intended to turn her in for welfare fraud. The trial court found, first, that petitioner had failed to produce any evidence that the victim's mother had committed welfare fraud or that further investigation by trial counsel would have uncovered evidence helpful to this theory of defense. (RT at 552-54.) The trial court also concluded that petitioner did not suffer any prejudice in connection with the claim because his counsel did in fact raise a defense that the victim's mother caused her daughter to fabricate the allegations against petitioner because of petitioner's threat to turn her in for welfare fraud, and supported that defense with his cross-examination of the mother and in argument to the jury. (Id. at 553-57.) Finally, the trial court noted that the mother was not the victim of petitioner's crimes. (Id.) With respect to petitioner's claim that his trial counsel should have "elicited from Detective Ford an admission that he was aware of the welfare fraud issue in this case, since petitioner had told him that he had reported [the victim's] mother for violations," the trial court ruled that such

evidence "is not probative value of whether the defendant had threatened her for the welfare fraud and how that affected her, if it had occurred," and that the evidence would have "added nothing" to the proceedings. (Id. at 557.)

The Sixth Amendment guarantees the effective assistance of counsel. The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984). To support a claim of ineffective assistance of counsel, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. Id. at 687-88. After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).

Second, a petitioner must establish that he was prejudiced by counsel's deficient performance. Strickland, 466 U.S. at 693-94. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

In assessing an ineffective assistance of counsel claim "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance.'" Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting Strickland, 466 U.S. at 689). There is in addition a strong presumption that counsel "exercised acceptable professional judgment in

all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).  However, that deference "is predicated on counsel's performance of sufficient investigation and preparation to make reasonably informed, reasonably sound judgments." Mayfield v. Woodford, 270 F.3d 915, 927 (9th Cir. 2001) (en banc).

Petitioner has failed to establish prejudice with respect to his claim that his trial counsel rendered ineffective assistance by failing to pursue and support a defense that the allegations against petitioner were manufactured by the victim's mother.  As noted by the state trial court, counsel did in fact present the defense suggested by petitioner and attempted to support that defense with evidence and argument.  Petitioner has failed to come forward with any other specific evidence in support of this theory of defense that would have led to a different outcome at trial.

This court also notes that petitioner has failed to explain why the victim's mother would falsely accuse him of molesting her daughter, when this would force her daughter to become a witness in a criminal trial and testify falsely on the witness stand about a very sensitive subject, simply because petitioner had threatened to implicate her of welfare fraud.  This argument strains common sense and is unsupported in any evidence.  Finally, with regard to counsel's failure to call Detective Ford as a witness to testify that he was aware of petitioner's allegations that the mother was engaged in welfare fraud, this court agrees with the state trial court that the failure to introduce such evidence at trial was not prejudicial to petitioner.  There is no reasonable probability that the outcome of the proceedings would have been different if counsel had elicited this testimony from Detective Ford at trial.

CONCLUSION

Accordingly, for the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

30

days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: May 18, 2009.

DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:8
vanek1576.hc

31